[Crim. No. 18795. In Bank. Feb. 25, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL KENNETH RAMEY, Defendant and Appellant.

## COUNSEL

Robert L. Layton and Harold D. Winingar, under appointments by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Joel Carey and J. Robert Jibson, Deputy Attorneys General, for Plaintiff and Respondent.

John E. Howard, Acting District Attorney (Los Angeles), Harry B. Sondheim and Arnold T. Guminski, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant was charged by information with possession of marijuana for sale, possession of amphetamines, and possession of a sawed-off shotgun. He pleaded not guilty and moved to suppress the evidence pursuant to Penal Code section 1538.5. The motion was granted in part and denied in part. Thereafter defendant negotiated a plea whereby he pleaded guilty to the lesser included offense of possession of marijuana (Health & Saf. Code, § 11357), and the prosecution dropped the remaining counts. Defendant now appeals, asserting as error the partial denial of his motion to suppress. (Pen. Code, § 1538.5, subd. (m).)

On July 30, 1973, the residence of one James Turner of Sacramento was burglarized. Among the items taken were several firearms, one of

which was a distinctive weapon, a .38 caliber Smith & Wesson Airweight. Turner immediately reported the burglary to the Sacramento police.

Turner, who was a licensed private investigator and former security guard, also decided to investigate his own case. His inquiries led him to two individuals, Reed and Weaver. Reed informed Turner that defendant Ramey had purchased the stolen weapon from Weaver. Turner was slightly acquainted with defendant, and decided to confront him about the stolen weapon.

On the afternoon of August 17, 1973, Turner went to defendant's home. Defendant first told Turner he had been offered the stolen weapon but had not purchased it. Turner insisted he had heard that defendant had bought the Airweight. Defendant responded, "oh, that one," and said he had not known it was Turner's.[1] Defendant then admitted he had owned it briefly but said he had sold it to "some white guy." When pressed for details, defendant could not supply any further information concerning the purchaser. Turner considered defendant's manner and responses evasive and believed he was still in possession of the stolen weapon.

Turner again contacted the Sacramento police and spoke to Detective Joel Garcia. He related to Garcia the chain of events leading him to defendant's residence and his suspicion aroused by his conversation with defendant. Garcia concluded from Turner's information that there was probable cause to arrest defendant for the offense of receiving stolen property.[2]

After a delay of some three hours, Garcia and six other officers proceeded to defendant's residence to effect the arrest of defendant and his roommate. As is the standard departmental practice, Garcia did not secure an arrest warrant prior to the prospective arrest.[3]

---

[1]Some time later, defendant's brother entered the room and defendant said, "Remember that .38 we just got rid of? It belonged to him [indicating Turner]."

[2]Turner also told Garcia that while he was in the Ramey apartment another occupant brought out two handguns; there was no indication, however, that the guns were other than lawfully possessed. In addition, Turner said he saw some marijuana in the living room, but Garcia did not believe there was probable cause to arrest for a narcotics violation because there was no showing that Turner was experienced in the field of narcotics identification.

[3]In response to a question by defense counsel as to whether there had been any attempt to obtain an arrest warrant, Garcia testified: "That is not our practice in burglary. We just go out there and arrest the people when they're readily available. If they're not available, then we'll submit for an arrest warrant and put [it] on the NCIC computer so they can arrest in Fresno or wherever they are."

Upon arriving at the apartment the officers drew their service revolvers and knocked. Defendant opened the door, and the officers identified themselves and displayed their badges. Defendant backed away towards a portable bar in the living room. The police followed him in, and when defendant was seen to reach behind the bar one of the officers grasped his arm and placed him under arrest. Detective Garcia looked behind the bar and found a .45 caliber pistol, three "lids" of marijuana in cellophane baggies, and a baggie containing tablets appearing to be benzedrine. The officers then seized other marijuana in plain view.

After placing defendant and his roommate under arrest the police searched the entire premises, discovering additional contraband. None of the items found, however, related to the Turner burglary. At the section 1538.5 hearing only those items of evidence seized in the living room were ruled admissible; the remainder was ordered suppressed under the rule of *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].

Defendant attacks the validity of the seizure on the ground that the arrest itself was unlawful, thereby vitiating any claim that the search was conducted incident to a valid arrest. He charges illegality on two alternate theories. First, it is urged that Turner was an untested informant whose credibility had not been established and whose information thus could not furnish probable cause to arrest. Secondly, it is contended that even if there was probable cause the arrest was nevertheless invalid because article I, section 13, of the California Constitution and the Fourth Amendment to the federal Constitution require that in the absence of exigent circumstances a warrant must be obtained prior to an intrusion into the home for the purpose of effecting an arrest.

I

The issue of probable cause turns on the facts known to Detective Garcia prior to the arrest. Here the sole source of that knowledge was the information related to Garcia by Turner. The question is whether it was reasonable for Garcia to rely on that information.

The courts have recognized a distinction between informers who are virtual agents of the police and "citizen informants" who are chance witnesses to or victims of crime. The former are often criminally disposed or implicated, and supply their "tips" to the authorities on a

recurring basis, in secret, and for pecuniary or other personal gain. The latter are innocent of criminal involvement, and volunteer their information fortuitously, openly, and through motives of good citizenship. (See generally *People* v. *Schulle* (1975) 51 Cal.App.3d 809, 814-815 [124 Cal.Rptr. 585], and cases cited.) Because of these characteristics, the requisite showing of reliability in the case of a citizen informant is significantly less than that demanded of a police informer. (*People* v. *Duren* (1973) 9 Cal.3d 218, 240 [107 Cal.Rptr. 157, 507 P.2d 1365]; *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 421-422 [96 Cal.Rptr. 455, 487 P.2d 1023], and cases cited.)

■ It may therefore be stated as a general proposition that private citizens who are witnesses to or victims of a criminal act, absent some circumstance that would cast doubt upon their information, should be considered reliable. This does not, of course, dispense with the requirement that the informant—whether citizen or otherwise—furnish underlying facts sufficiently detailed to cause a reasonable person to believe that a crime had been committed and the named suspect was the perpetrator; and the rule also presupposes that the police be aware of the identity of the person providing the information and his status as a true citizen informant. (*People* v. *Abbott* (1970) 3 Cal.App.3d 966, 970-971 [84 Cal.Rptr. 40].) In short, probable cause will not be provided by conclusionary information or anonymous informants, but neither a previous demonstration of reliability nor subsequent corroboration is ordinarily necessary when witnesses to or victims of criminal activities report their observations in detail to the authorities.[4]

■ In the present case Detective Garcia could reasonably believe that Turner was a citizen informant as herein defined. Moreover, an additional demonstration of reliability was presented in Turner's ongoing relationship with the Sacramento police: while his occupation would not of itself cloak him with any presumption of credence, there was evidence that he had dealt with the Sacramento police on other occasions without raising doubts as to his trustworthiness. For all these reasons, Detective Garcia could accept as true Turner's representations as to the circumstances which led him to defendant's residence, and the statements which defendant there made.

■ Having established that Turner was a reliable informant, we consider the remaining question whether the information he supplied

[4]To the extent that *People* v. *Legard* (1970) 12 Cal.App.3d 1006, 1010 [91 Cal.Rptr. 257], implies a stricter standard for judging the reliability of a citizen informant, it is disapproved. (See *People* v. *Schulle* (1975) *supra,* 51 Cal.App.3d 809, 816 & fn. 2.)

was sufficient to constitute probable cause to believe defendant guilty of the crime of receiving stolen property.

Defendant contends the information given to Garcia consisted mainly of Turner's mere speculation that defendant was still in possession of the stolen Airweight. However, Garcia testified that he believed there was probable cause to arrest defendant for the offense of *receiving* stolen property, a crime which does not necessitate continuing possession of the goods. (Pen. Code, § 496, subd. 1.)

With regard to this offense there was ample showing to support a conclusion of probable cause. The key evidence, of course, was defendant's own admission to Turner that he had purchased the weapon and had actually "received" it. After this admission the only element of the offense still open to question was defendant's subjective knowledge that the weapon was stolen. This is an element which must be inferred from the circumstances. As we recently stated in *People* v. *Martin* (1973) 9 Cal.3d 687, 696 [108 Cal.Rptr. 809, 511 P.2d 1161], "Possession of a stolen item in and of itself is a factor which could assist a reasonable person in formulating a strong suspicion that the recipient knew the item was stolen." In addition, defendant apparently came into possession of the gun shortly after the burglary; he did not disclose to Turner the identity of the person from whom he had purchased it; and he conceded that he quickly "got rid of" the gun by selling it to an apparent stranger. Taken together, these circumstances supported an inference of guilty knowledge. Detective Garcia therefore had probable cause to arrest defendant for the crime of receiving stolen property.

II

But this determination does not end our inquiry. Defendant further contends that even if there was probable cause, the arrest was invalid because of the failure of the police to secure an arrest warrant prior to intruding into the privacy of his home. It is urged that just as warrantless searches of a private dwelling are unreasonable per se in the absence of one of a small number of carefully circumscribed exceptions (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34-35 [26 L.Ed.2d 409, 413-414, 90 S.Ct. 1969], and cases cited), so too are warrantless arrests within the home unreasonable unless there are exigent circumstances sufficient to justify dispensing with the warrant requirement. The People respond that in California an arrest without a warrant may be made whenever the police have reasonable cause to believe the suspect has committed a

felony (Pen. Code, § 836), and that the only condition precedent to an arrest within the home is that the police comply with the statutory "knock and notice" provision (Pen. Code, § 844). Defendant recognizes that no statute imposes the requirement he now asks us to adopt, but asserts that the legislative silence on the matter is overridden by the demands of the Constitution.

■ Our analysis proceeds from the premise that the proscriptions of unreasonable searches and seizures contained in article I, section 13, of the California Constitution and the Fourth Amendment to the United States Constitution embrace seizures of the person as well as seizures of property. The authority for this proposition appears first in the language of the Constitution itself. In pertinent part article I, section 13, of the California Constitution forbids any violation of "The right of the people to be secure in their persons, [and] houses, . . . against unreasonable seizures," and declares that no warrant shall issue except on probable cause particularly describing "the persons . . . to be seized." The Fourth Amendment uses similar wording.

(4b) The United States Supreme Court has not yet resolved the issue of whether the Fourth Amendment requires a warrant for arrests within the home. However, in *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022], five members of the court expressed agreement with the proposition that "It is clear, then, that the notion that the warrantless entry of a man's house in order to arrest him on probable cause is *per se* legitimate is in fundamental conflict with the basic principle of Fourth Amendment law that searches and seizures inside a man's house without warrant are *per se* unreasonable in the absence of some one of a number of well defined 'exigent circumstances.' " (*Id.,* at pp. 477-478 [29 L.Ed.2d at pp. 589-590].) Rejecting Justice White's dissenting views on this point, the majority observed (at p. 480 [29 L.Ed.2d at p. 591]) that "If we were to agree with Mr. Justice White that the police may, whenever they have probable cause, make a warrantless entry for the purpose of making an arrest, . . . then by the same logic *any* search or seizure could be carried out without a warrant, and we would simply have read the Fourth Amendment out of the Constitution. Indeed, if Mr. Justice White is correct that it has generally been assumed that the Fourth Amendment is not violated by the warrantless entry of a man's house for purposes of arrest, it might be wise to re-examine the assumption. Such a re-examination 'would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon

probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment.' *Jones* v. *United States,* 357 U.S., at 499-500 [per Harlan, J.]." (Italics in original.)

As additional authority the majority pointed to the case of *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642]: that decision, "where the Court elaborated a 'hot pursuit' justification for the police entry into the defendant's house without a warrant for his arrest, certainly stands by negative implication for the proposition that an arrest warrant is required in the absence of exigent circumstances. See also *Davis* v. *Mississippi,* 394 U.S. 721, 728; *Wong Sun* v. *United States,* 371 U.S., at 481-482." (*Id.,* at pp. 480-481 [29 L.Ed.2d at p. 591].) Citing *Dorman* v. *United States* (1970) 435 F.2d 385 [140 App.D.C. 313], the majority also noted (at p. 481 [29 L.Ed.2d at p. 591]) that "The Court of Appeals for the District of Columbia Circuit, sitting *en banc,* has unanimously reached the same conclusion."

In the circumstances of *Coolidge,* however, the court found it unnecessary to decide the issue, holding (*ibid.*) that the warrant requirement for searches "is not so frail that its continuing vitality depends on the fate of a *supposed* doctrine of warrantless arrest." (Italics added.) Since *Coolidge,* the point has not been squarely adjudicated. (See, e.g., *United States* v. *Watson* (1976) 423 U.S. 411, 418, fn. 6 [46 L.Ed.2d 598, 605, 96 S.Ct. 820].)

Our own cases, although frequently referring to the statutory formula for making warrantless arrests (see, e.g., *People* v. *Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583]), have never truly confronted the issue of the constitutionality of warrantless arrests in the home. Defendant relies heavily on language in *People* v. *Privett* (1961) 55 Cal.2d 698, 703 [12 Cal.Rptr. 874, 361 P.2d 602], where we stated: "The sanctity of a private home is not only guaranteed by the Constitutions of the United States and of our own state, but it is traditional in our Anglo-Saxon heritage. 'A man's home is his castle' is, and should be, more than an empty phrase. The Constitutions themselves point to the proper procedure to be followed in invading this precious sanctity. . . . There was no emergency in this case which would have prevented the officers from seeking a warrant from a magistrate to enter this home. . . . Although a private home may be broken into without a warrant, even in the nighttime, if probable cause exists, in doubtful cases the householder

should be entitled to have the protection of the independent judgment of a magistrate before the constitutionally guaranteed sanctity of his home is invaded." But this language, like that in *Coolidge,* was dictum; and while persuasive, it does not definitively resolve the constitutional question.

Nevertheless, a number of federal and state appellate courts have been squarely presented with the issue, and have rendered decisions in conformity with the sentiments expressed in *Coolidge* and *Privett.* First, as the Supreme Court noted in its *Coolidge* opinion, the Court of Appeals for the District of Columbia Circuit, sitting en banc, unanimously held that in the absence of a true emergency a warrantless entry into a home to arrest a suspect violates the Fourth Amendment. (*Dorman v. United States* (1970) *supra,* 435 F.2d 385.) The court reasoned that "The Fourth Amendment protects a right of privacy. This is a right that is increasingly recognized in decisions involving this and other provisions of the Constitution as a core protection safeguarding all citizens against unwarranted intrusions by police and other government officials.

"The Fourth Amendment provides protection even as to arrest in a public place, though in such cases the requirement is only that there be probable cause and there is no additional requirement of recourse to a warrant. A greater burden is placed, however, on officials who enter a home or dwelling without consent: Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment. In general a home may not be searched without a warrant notwithstanding probable cause." (Fns. omitted.) (*Id.,* at p. 389.) Reviewing a number of Supreme Court decisions, the court concluded that "the requirement of a warrant may be excused where circumstances do not tolerate delay, like that incident to obtaining a warrant, of an officer making an arrest. But the basic principle, the constitutional safeguard that, with room for exceptions, assures citizens the privacy and security of their homes unless a judicial officer determines that it must be overridden, is applicable not only in case of entry to search for property, *but also in case of entry in order to arrest a suspect.*" (Italics added.) (*Id.,* at p. 390.)

Identical views have been expressed by other federal appellate courts. In *Vance v. North Carolina* (4th Cir. 1970) 432 F.2d 984, the Court of Appeals for the Fourth Circuit impliedly adopted the position in *Dorman* that "an arrest inside a dwelling without a warrant, or pursuant to an invalid warrant, is *per se* unreasonable under the fourth amendment

unless there are 'exigent circumstances' justifying the police in bypassing a magistrate . . . ." (*Id.,* at p. 990.) Similarly, in *United States* v. *Shye* (6th Cir. 1974) 492 F.2d 886, the Court of Appeals for the Sixth Circuit applied as the rule of *Dorman* the principle that "the warrantless entry of a dwelling to arrest [is] put on the same constitutional footing as warrantless entry of a dwelling for a search. *See: Coolidge* v. *New Hampshire,* 403 U.S. 443, at 454-455 . . . . Entry in both instances is *per se* unreasonable unless 'exigent circumstances' justify the failure to obtain the warrant." (*Id.,* at p. 891.) Again, in *United States* v. *Phillips* (9th Cir. 1974) 497 F.2d 1131, 1135, the Court of Appeals for the Ninth Circuit cited *Dorman* for the proposition that "The constitutional safeguard that assures citizens the privacy and security of their homes unless a judicial officer determines that it must be overridden, is applicable not only in case of entry to search for property, but also in cases of entry to arrest a suspect." (See also *Salvadore* v. *United States* (8th Cir. 1974) 505 F.2d 1348, 1351-1352.)

The most recent state court decision recognizing that the warrant requirement applies to arrests within the home was rendered by the Supreme Court of Massachusetts. (*Commonwealth* v. *Forde* (Mass. 1975) 329 N.E.2d 717.) Prior to *Forde* the law in Massachusetts permitted police officers to conduct warrantless arrests in homes on probable cause alone. (*Commonwealth* v. *Phelps* (1911) 209 Mass. 396 [95 N.E. 868, 873].) Relying on the above-quoted dictum of *Coolidge* (403 U.S. at pp. 477-478 [29 L.Ed.2d at pp. 589-590]), the Massachusetts court reasoned that "The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy. It was just this sort of intrusion that the Fourth Amendment was designed to circumscribe by the general requirement of a judicial determination of probable cause. [Citations.] The distinction between an entry to search and an entry to arrest is slight, for the latter may well be characterized as simply a search for a person rather than a search for things. [Citations.] Moreover, it can be argued that an entry to arrest is a far greater intrusion than an entry to search. Coolidge v. New Hampshire, *supra,* 403 U.S. at 479-480, 91 S.Ct. 2022. The exigencies which would excuse the lack of an arrest warrant may differ from those supplying the excuse for the lack of a search warrant. In any event, the police are required to demonstrate that exigency. In short, we believe that the Fourth Amendment prohibits a warrantless entry into a dwelling to arrest in the absence of sufficient justification for the failure to obtain a

warrant. [5] While this conclusion departs from the old law of the Commonwealth, the same result has been reached by nearly every court to address the issue in recent years. [Citations.]" (*Id.,* at pp. 722-723.)

Our own view of the matter comports with the *Coolidge* dictum and the opinions in the above-cited state and federal cases. An intrusion by the state into the privacy of the home for any purpose is one of the most awesome incursions of police power into the life of the individual. Unrestricted authority in this area is anathema to the system of checks envisaged by the Constitution. It is essential that the dispassionate judgment of a magistrate, an official dissociated from the "competitive enterprise of ferreting out crime" (*Johnson* v. *United States* (1948) 333 U.S. 10, 14 [92 L.Ed. 436, 440, 68 S.Ct. 367]), be interposed between the state and the citizen at this critical juncture. The frightening experience of certain foreign nations with the unexpected invasion of private homes by uniformed authority to seize individuals therein, often in the dead of night, is too fresh in memory to permit this portentous power to be left to the uninhibited discretion of the police alone.[6]

Moreover, it is incongruous to pay homage to the considerable body of law that has developed to protect an individual's belongings from unreasonable search and seizure in his home, and at the same time assert that identical considerations do not operate to safeguard the individual himself in the same setting. Where genuine exigencies exist, broad constitutional mandates often give way to the necessity for immediate action, and an arrest is no exception to this rule. But in the absence of a bona fide emergency, or consent to enter, police action in seizing the individual in the home must be preceded by the judicial authorization of an arrest warrant.

■ For the foregoing reasons we hold that the protection of article I, section 13, of the California Constitution and the Fourth Amendment of the federal Constitution against violation of the right of the people to be

---

[5]In a footnote at this point the court specified that "Our holding does not imply that warrantless arrests in general must be justified by exigent circumstances excusing the lack of a warrant but, rather, is limited to warrantless entries of dwellings for the purpose of making arrests within those dwellings." (329 N.E.2d at p. 722, fn. 3.) Our holding herein is likewise limited.

[6]As Justice Jackson warned not long after his experience as prosecutor at the Nuremberg trials, "Essential freedoms are today threatened from without and within. It may become difficult to preserve here what a large part of the world has lost. . . ." (*Kunz* v. *New York* (1951) 340 U.S. 290, 295 [95 L.Ed. 280, 284-285, 71 S.Ct. 328] (dissenting opn.).)

secure in their persons and houses against unreasonable seizures applies to arrests within the home, and that warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances.[7]

The remaining issue is whether there were exigent circumstances justifying the warrantless arrest in the present case. In this context, "exigent circumstances" means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.

In the case at bar it is clear there was no imminent danger to life or property, and no likelihood of flight or destruction of evidence. Defendant was arrested for the offense of receiving stolen property, a nonviolent crime evidencing no propensity for endangering life. While it is true the stolen article was a firearm, there was no reason for Detective Garcia to assume the weapon was available for immediate use; on the contrary, according to Garcia's information the weapon had been sold and was no longer in defendant's possession. The other firearms said to be in defendant's apartment had been freely shown to Turner. Detective Garcia had no ground for inferring they were illegally possessed or presented an imminent danger to life.

Thus the information on which Garcia acted tended to show only that defendant had once received an item of stolen property, was probably no longer in possession of that item, and from all appearances was not likely to be fleeing the jurisdiction. In addition, a delay of some three hours occurred between the time the information was given to Garcia and the arrest in defendant's home, during which period no effort whatever was made to obtain a warrant. The delay took place in the middle of a weekday afternoon, while magistrates were readily available for issuance of warrants. In *Commonwealth* v. *Forde* (1975) *supra,* 329 N.E.2d 717, an identical three-hour opportunity to obtain an arrest warrant occurred at night, yet the court nevertheless relied on it in part in rejecting a claim of

---

[7]Insofar as it is to the contrary, *People* v. *Williams* (1971) 17 Cal.App.3d 554, 561-562 [95 Cal.Rptr. 234], is disapproved.

We recognize that numerous prior decisions of this court and the California Courts of Appeal have assumed the legality of a warrantless entry into a home to make a felony arrest in the absence of exigent circumstances, providing there is probable cause. Accordingly, except as to the defendant in the case at bar, the rule we now adopt will apply only to arrests made after this opinion becomes final.

emergency: "It is impossible to find one's way around the delay of three hours in seeking the warrants. In the face of this delay the possible warning of the defendant which most likely would have been directed toward the destruction of evidence rather than his escape does not achieve the level of an exigency."

Because the contraband which formed the basis of the conviction was thus seized incident to an invalid arrest, the trial court erred in failing to grant the motion to suppress in its entirety.

The judgment is reversed.

Wright, C. J., Tobriner, J., Sullivan, J., and Richardson, J., concurred.

**CLARK, J.**—Our deference toward the United States Supreme Court is fast becoming a shell game. Opinions not commanding a majority of that court are held controlling; authoritative opinions adhered to by a majority of the court are rejected. In reliance on mere dictum in the plurality opinion in *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022], the majority interpret the search and seizure clauses of the federal and California Constitutions to prohibit warrant-less arrests within the home in the absence of an emergency, overturning "numerous prior decisions of this court and the California Courts of Appeal." (*Ante*, p. 276, fn. 7.) By contrast, when the United States Supreme Court authoritatively construed the Fourth Amendment to permit full body search of a person subjected ,to custodial arrest, regardless of his offense or whether he is ultimately to be incarcerated (*United States* v. *Robinson* (1973) 414 U.S. 218 [38 L.Ed.2d 427, 94 S.Ct. 467]; *Gustafson* v. *Florida* (1973) 414 U.S. 260 [38 L.Ed.2d 456, 94 S.Ct. 488]), a majority of this court nevertheless interpreted virtually identical language in the California Constitution to impose a "more exacting standard." (*People* v. *Brisendine* (1975) 13 Cal.3d 528 [119 Cal.Rptr. 315, 531 P.2d 1099]; *People* v. *Norman* (1975) 14 Cal.3d 929 [123 Cal.Rptr. 109, 538 P.2d 237].) To give but one more example, when the United States Supreme Court authoritatively construed the Fifth Amendment to permit impeachment of a defendant with his extrajudicial statements obtained in violation of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] (*Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]), the same majority of this court nevertheless interpreted virtually identical language in the California Constitution to prohibit such impeachment. (*People* v. *Disbrow* (1976) *ante*, p. 101 [127 Cal.Rptr. 360, 545 P.2d 272].)

Today, because it happens to coincide with their own view, the majority resort to mere dictum in the plurality opinion in *Coolidge* v. *New Hampshire, supra.* However, as will be explained below, when they disagreed with another aspect of the same opinion, a majority of this court rejected it noting that the issue had been considered by an equally divided court, "and hence was not actually *decided.*" (*People* v. *McKinnon* (1972) 7 Cal.3d 899, 911 [103 Cal.Rptr. 897, 500 P.2d 1097], italics in the original.) Moreover, contrary to the representation made by the majority, the dictum upon which they now rely was not joined by five members of the high court. It appears in Part II D of the opinion prepared for the court by Justice Stewart and signed by Justices Douglas, Brennan and Marshall. Justice Harlan concurred in the judgment and in Parts I, II D, and III of that opinion; however, his concurring opinion made it clear that he expressed no view on the question before us.[1] Furthermore, the dictum in the plurality opinion no longer expresses the view of even four members of the court, Justice Douglas having retired in the interim.[2]

Actually, rather than supporting the majority's position, the reasoning of the plurality opinion in *Coolidge* supports the conclusion that, because of the ever-present danger of escape arising from man's characteristic "mobility," entry into a residence to effect a probable cause arrest need not be delayed until a warrant is obtained.

[1] "Recent scholarship has suggested that in emphasizing the warrant requirement over the reasonableness of the search the Court has 'stood the fourth amendment on its head' from a historical standpoint. T. Taylor, Two Studies in Constitutional Interpretation 23-24 (1969). This issue is perhaps most clearly presented in the case of a warrantless entry into a man's home to arrest him on probable cause. The validity of such entry was left open in *Jones* v. *United States,* 357 U.S. 493, 499-500 (1958), and although my Brothers White and Stewart both feel that their contrary assumptions on this point are at the root of their disagreement in this case . . . the Court again leaves the issue open. . . . In my opinion it does well to do so. This matter should not be decided in a state case not squarely presenting the issue and where it was not fully briefed and argued. *I intimate no view on this subject*, but until it is ripe for decision, I hope in a federal case, I am unwilling to lend my support to setting back the trend of our recent decisions." (403 U.S. at p. 492 [29 L.Ed.2d at p. 598] (Harlan, J., concurring), italics added.)

[2] The reliability of the dictum was further undercut recently by *United States* v. *Watson* (1976) 423 U.S. 411 [46 L.Ed.2d 598, 96 S.Ct. 820]. In *Watson,* the court held that the Fourth Amendment permits a police officer to make a warrantless felony arrest in a public place even though the officer has an adequate opportunity to obtain a warrant after developing probable cause for arrest. *Watson* did not present the question whether warrantless probable cause arrests within the home are permissible in the absence of an emergency. (423 U.S. at pp. 418, fn. 6, 419-424 [46 L.Ed.2d at pp. 605, 609] (Stewart, J., concurring in the result) 423 U.S. at p. 433 [46 L.Ed.2d p. 614] (Powell, J., concurring).) However, as the dissent pointed out, the reasoning of the *Watson* majority strongly suggests that the high court will eventually resolve this question in favor of the constitutionality of such arrests. (See 423 U.S. at pp. 453-455 [46 L.Ed.2d at p. 627] (Marshall, J., dissenting).)

In *Coolidge,* the court considered the scope of the "automobile exception" to the general rule that probable cause to believe contraband will be found concealed in certain property does not justify a warrantless search that is neither consensual nor incidental to a lawful arrest, absent an emergency. The ground for this exception was reiterated in *Chambers* v. *Maroney* (1970) 399 U.S. 42, 51 [26 L.Ed.2d 419, 428, 90 S.Ct. 1975]: *"Carroll* [v. *United States* (1925) 267 U.S. 132 (69 L.Ed. 543, 45 S.Ct. 280, 39 A.L.R. 790)] holds a search warrant unnecessary where there is probable cause to search an automobile stopped on a highway; the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained. Hence an immediate search is constitutionally permissible."

In *Chambers* v. *Maroney, supra,* police stopped a vehicle based on eyewitness descriptions of robbers and their getaway car. The occupants were arrested, but the car was not searched at the scene. Instead, it was driven to the police station where a later search revealed weapons and incriminating evidence hidden under the dashboard. Affirming a denial of federal habeas corpus after convictions of robbery, the high court held that a search—reasonable at the time and place the car was stopped— does not become unreasonable because conducted later at the police station.

In *Coolidge,* after arresting a murder suspect in his home, police seized his automobile and searched it later at the police station, finding evidence that the victim had been inside the vehicle. The members of the court signing the plurality opinion found the automobile exception to the warrant requirement inapplicable because there was no real danger that the vehicle would be moved before a search warrant could be obtained. The murder suspect had been arrested. His wife, the only other adult occupant of the house had been informed by the police that she had to spend the rest of the night elsewhere and that she could not use the car. Two policemen then drove her to the house of a relative in another town, and they stayed with her until midnight, long after the car had been towed to the police station. In the interim, the car had been parked in the driveway of the Coolidge residence, which was guarded throughout the night by two policemen.

In *People* v. *McKinnon* noted above, this court declined to follow the portion of the *Coolidge* plurality opinion "which purports to narrow the *Carroll-Chambers* rule." (7 Cal.3d at p. 911.) In *McKinnon,* this court held that a chattel consigned to a common carrier for shipment may lawfully be searched upon probable cause to believe it contains

contraband. In *People* v. *McGrew* (1969) 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1], this court had reached the opposite conclusion on the ground that, the chattels being in the custody of the airlines and the airlines being under no obligation to ship them before a search warrant could be obtained, there was no likelihood that the chattels would be removed or the contraband contained therein destroyed. The officers having had time to obtain a search warrant but having failed to do so, their search of the chattels was ipso facto "unreasonable" within the meaning of the Fourth Amendment. Noting that the intervening *Chambers* decision had rejected the same line of reasoning in the context of an automobile search, the *McKinnon* court declined to adhere to *McGrew,* concluding. that chattels consigned to a common carrier are no less movable than vehicles and that they are therefore subject to the same exception to the search warrant requirement.

In his dissenting opinion, Justice Peters argued that *Coolidge* foreclosed application of the *Carroll-Chambers* rule in the circumstances of *McKinnon.* Anticipating the argument, the majority first distinguished *Coolidge,* then stated that—four justices having signed the opinion of the court in *Coolidge,* one justice (Harlan) having concurred in the judgment but having declined to join the pertinent part of the plurality opinion, and the remaining four justices having expressly disagreed with that portion of the plurality opinion—"It follows that the *Carroll-Chambers* issue raised by the plurality opinion in *Coolidge* was in fact considered by an equally divided court, and hence was not actually *decided:* under settled doctrine, the judgment of an equally divided United States Supreme Court 'is without force as precedent.' " (*People* v. *McKinnon, supra,* 7 Cal.3d at p. 911.) In *People* v. *Laursen* (1972) 8 Cal.3d 192 [104 Cal.Rptr. 425, 501 P.2d 1145], relying on *Chambers* and refusing to follow *Coolidge* for the reasons stated in *McKinnon,* this court upheld the warrantless search of an automobile abandoned by robbers and transported to the police impound garage where it was searched hours later.

The point of this extended discussion is that the majority's position is anomalous in the extreme. On the one hand, they hold that an automobile's characteristic mobility justifies a warrantless search even if, as a practical matter, delaying the search to obtain a warrant would entail no risk because the vehicle is immobilized and secured by impoundment. On the other hand, they hold that police must not arrest a man in his home until a warrant is obtained even if, as here, the suspect is known to be armed and likely to flee, having just been visited by his victim and accused of the crime. An automobile is mobile only insofar as

it is set in motion by a man. Nevertheless, in the circumstances of *Coolidge,* the majority would seize the car and allow the man to escape!

It is hoped that this anomaly does not spring from mistrust of a policeman's motives.[3] However, the majority appear to assume that the police chose to arrest defendant in his home, rather than elsewhere, in order to search his residence and seize evidence of the crime. However, the record is to the contrary. This is not a case in which police, having numerous opportunities to arrest a suspect at other locations, wait until he returns home. Defendant just happened to be at home when the police first received information providing probable cause to arrest him. Moreover, had defendant not retreated into the living room in an apparent attempt to secure the weapon or destroy the contraband behind the bar, the arrest would have occurred at the door, restricting the scope of the incidental search to the area within defendant's reach. (*Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].) Finally, it is settled that "when it appears that the search and not the arrest was the real object of the officers in entering upon the premises and that the arrest was a pretext for or at most an incident of the search, the search is not reasonable within the meaning of the Constitution." (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1110 [80 Cal.Rptr. 633, 458 P.2d 713]; see *People* v. *Haven* (1963) 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927]; see also *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 154 [98 Cal.Rptr. 649, 491 P.2d 1].) The rule announced today is unneeded to curb this or any other abuse.

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied April 15, 1976. Clark, J., was of the opinion that the petition should be granted.

---

[3]To condemn these good officers by associating their conduct with the tactics of totalitarian regimes—either past or present (see *ante*, p. 275)—is grossly unjust.